NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

OVIE P. EMEOFA, et al., *Plaintiffs/Appellants*,

*v.*

RONALD E. SMITH, et al., *Defendants/Appellees*.

No. 1 CA-CV 21-0762
FILED 12-6-2022

Appeal from the Superior Court in Maricopa County
No. CV2020-007902
The Honorable Timothy J. Thomason, Judge

**AFFIRMED**

COUNSEL

Ovie P. Emeofa, Glendale
*Plaintiff/Appellant*

Engelman Berger PC, Phoenix
By Wade M. Burgeson
*Counsel for Defendants/Appellees*

_____

## MEMORANDUM DECISION

Chief Judge Kent E. Cattani delivered the decision of the Court, in which Acting Presiding Judge James B. Morse Jr. and Judge Michael J. Brown joined.

_____

**C A T T A N I**, Chief Judge:

**¶1**　　　　Ovie Emeofa appeals the superior court's judgment and award of attorney's fees in favor of Ronald and Tammy Smith on Emeofa's claims related to a commercial real estate transaction, as well as the court's denial of his motion for new trial on the fee award. For reasons that follow, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

**¶2**　　　　In late 2018, Emeofa and his wife contracted to buy a commercial property in Glendale from the Smiths. In addition to paying an earnest money deposit, the Emeofas financed the purchase with a $240,000 seller carry-back promissory note bearing 5% simple interest, secured by a deed of trust on the property. The note incorporated a payment schedule that called for monthly interest-only payments coupled with semiannual $25,000 principal payments. The purchase agreement set a closing date of January 2, 2019, but the sale did not close until April 8, 2019.

**¶3**　　　　The parties began to disagree about payments almost immediately. The Smiths insisted that, as stated in the original payment schedule attached to the note, the Emeofas owed monthly interest payments for January through March 2019, even though the transaction had not closed until April. The Emeofas disagreed, did not begin making interest payments until June 2019, and then submitted lump-sum checks in June, July, and August prepaying (as allowed under the note) a total of 9.5 months of interest. After that, they did not submit any additional payments (interest or principal) for over a year.

**¶4**　　　　Both sides eventually retained counsel, and in June 2020, the Smiths sent the Emeofas a notice of default demanding $58,000 to cure (presumably reflecting two semiannual $25,000 principal payments plus eight months of interest payments). Just weeks later, the Emeofas sued the Smiths asserting several claims premised on an allegation that the Smiths

had breached the parties' agreements by (1) failing to close until April 8, 2019 instead of January 2, 2019, (2) failing to make all required repairs to the premises, and (3) attempting to charge interest for the months before the transaction closed. The Smiths counterclaimed, alleging that the Emeofas had breached by failing to make timely payments of interest and principal under the note.

¶5        While the suit was pending, the Smiths noticed a trustee's sale for December 1, 2020. On September 8, 2020, the Emeofas tendered $105,000 in cashier's checks to reinstate the note and deed of trust, and they requested that any excess beyond the reinstatement amount "be applied towards the outstanding obligation under the note." They further requested that the Smiths confirm cancellation of the trustee's sale within two days. The Smiths responded that the Emeofas' payment exceeded the reinstatement amount by over $39,000 (the "Excess"), which they promised to "appl[y] to the current outstanding principal amount of the Note."

¶6        The Smiths declined to immediately record a cancellation of the trustee's sale, however, instead assuring the Emeofas that the sale would be cancelled as soon as the cashier's checks cleared the bank. Not satisfied with that assurance, on September 18, the Emeofas filed an application to enjoin the trustee's sale even though the sale was still more than two months away. The checks cleared just days later, and the Smiths recorded the cancellation of the sale (and sent confirmation to the Emeofas) on September 23. The Emeofas withdrew their injunction request.

¶7        Once the checks cleared and the note was reinstated, the Smiths sent the Emeofas a revised payment schedule. The new schedule applied the Excess "to the current outstanding principal amount" — that is, as of September 2020 — and reduced the Emeofas' monthly interest payment accordingly, but it left in place an obligation to make the semiannual principal payment of $25,000 due in December 2020. Two days later, the Emeofas responded that the Excess should have been applied as a prepayment of the semiannual principal payment, so no additional principal payment should be due in December 2020. The Smiths insisted that they had applied the Excess to the outstanding principal exactly as requested, and that neither the requirement nor the due date of the scheduled December 2020 principal payment could be modified.

¶8        The Emeofas did not make an additional principal payment in December 2020, and the Smiths sent them a notice of breach. In February 2021, the Emeofas filed a new request to enjoin a trustee's sale, notwithstanding that no sale had been noticed. The court denied an

injunction as unnecessary. The parties then participated in a settlement conference but were unable to reach a resolution.

¶9 On the merits, the Emeofas moved for partial summary judgment regarding the December 2020 semiannual principal payment and the January to March 2019 (pre-closing) monthly interest payments. The court denied summary judgment on the December 2020 principal payment, finding a question of fact as to how the Excess should have been applied. The court granted summary judgment in favor of the Emeofas on the pre-closing interest payments, however, concluding as a matter of law that no interest was owed until the sale closed in April 2020.

¶10 The court held a bench trial in mid-2021 at which Ovie Emeofa and both of the Smiths testified. As delineated in the parties' joint pretrial statement, the court addressed claims including: (1) failure to timely close the sale; (2) repairs required under the purchase agreement (although the Emeofas withdrew this claim just before trial); (3) the Smiths' posting of a notice of sale on the property after the Emeofas tendered of all amounts necessary to reinstate; (4) proper credit for the three months of pre-closing interest charged by the Smiths and paid by the Emeofas, given the court's summary judgment ruling that no such interest was owed; (5) proper application of the Excess and whether the Emeofas nevertheless owed a $25,000 semiannual principal payment for December 2020; and (6) the Smiths' request for an award of attorney's fees.

¶11 The court ruled that the first three of those claims were entirely meritless, specifically noting that the Emeofas had chosen to proceed with the purchase even though they could have cancelled the sale for pre-closing breaches and that the Smiths had timely cancelled the trustee's sale after reinstatement. The court reiterated its summary judgment ruling that no interest was owed before closing and held that the Emeofas were entitled to a refund of $3,000 that the Smiths had applied as January–March 2019 interest payments. And the court concluded that the Smiths had permissibly applied the Excess to principal (and not as the December 2020 semiannual payment) given the Emeofas' directive that the Excess was "to be applied towards the outstanding obligation under the note" (without designating it as a prepayment of the upcoming semiannual obligation) and the Smiths' September 2020 confirmation that they would apply the Excess "to the *current* outstanding principal amount of the Note." (Emphasis added.) The court noted, however, that the Smiths could easily have resolved the issue once the misunderstanding became evident—just two days after reinstatement—but instead "refused to budge" while continuing to insist that they were just doing what the Emeofas wanted.

¶12            The court determined that an award of "some fees" in favor of the Smiths was proper, explaining that the Emeofas' lawsuit was largely unnecessary and unsuccessful.  The court explained that, other than the issue of $3,000 in pre-closing interest, the Emeofas' original claims "had no merit," "were clearly waived," or simply "made no sense."  And the Emeofas had twice filed unnecessary requests to enjoin trustee's sales—one that the Smiths had promised to (and ultimately did) cancel as soon as the reinstatement checks cleared, and one that had not even been noticed.  But the court expressly noted that it would also consider the Emeofas' meritorious claim (regarding pre-closing interest) as well as the Smiths' unreasonable actions (failure to resolve the dispute about the Excess) when fixing the amount of the award.

¶13            After full briefing, the court awarded the Smiths $30,000 in attorney's fees (reduced from the nearly $86,000 requested).  In addition to the considerations explained in its earlier rulings, the court relied on the Smiths' assertion in their fee application—undisputed in the Emeofas' response—that the Emeofas had refused a walk-away settlement offer (under which the Smiths would have re-applied the Excess to satisfy the December 2020 principal payment and waived reimbursement of attorney's fees) during the settlement conference.

¶14            The court entered judgment in favor of the Smiths for $21,757.86 for the December 2020 semiannual principal payment (crediting the Emeofas $3,000 for pre-closing interest), plus $30,000 in attorney's fees and $1,612.25 in costs.  The Emeofas timely moved for a new trial on attorney's fees, asserting for the first time that they (not the Smiths) had made a walk-away settlement offer that the Smiths unreasonably rejected.  The Smiths denied this allegation in response, but neither side offered any evidence to prove what had occurred.  The court thus denied the motion.

¶15            Ovie Emeofa timely appealed.  We have jurisdiction under A.R.S. § 12-2101(A)(1), (5)(a).

## DISCUSSION

¶16            Emeofa appeals the superior court's judgment and denial of a new trial, asserting primarily that the court erred by approving the Smiths' treatment of the Excess and by awarding attorney's fees.

## I.      Merits Ruling.

¶17            Emeofa challenges the court's ruling approving use of the Excess as a free-standing principal payment without defraying the

December 2020 semiannual payment obligation, as well as certain findings regarding real estate licensure and status of repairs. On review after a bench trial, we consider the evidence in the light most favorable to affirming the ruling, accepting the superior court's findings of fact unless clearly erroneous. *Castro v. Ballesteros-Suarez*, 222 Ariz. 48, 51, ¶ 11 (App. 2009). We do not reweigh the evidence, and we defer to the court's factual assessment if supported by substantial (even if conflicting) evidence. *Id.* at 51–52, ¶ 11. We consider any legal conclusions de novo. *Id.* at 52, ¶ 12.

### A. The Excess.

¶18 After a comprehensive review and recitation of the trial evidence, the superior court concluded that the Smiths permissibly applied the Excess to the then-current principal obligation and not as a prepayment of the scheduled December 2020 semiannual principal payment. Emeofa argues that this ruling wrongly ignored a provision of the note permitting "[p]repayment in advance . . . in any amount and without penalty." Not so. The court expressly acknowledged that the note *permitted* prepayment, but it reasoned that the Smiths nevertheless were not *required* to apply the Excess as an early payment of the December 2020 semiannual payment because of the parties' communications about the Excess. Those communications support the court's interpretation.

¶19 When tendering the reinstatement payment in early September 2020, the Emeofas (through counsel) told the Smiths that the Excess should "be applied towards the outstanding obligation under the note" and reiterated that the Excess "shall go towards paying down the remaining amounts owed"; they did not reference the upcoming semiannual payment or otherwise indicate that they intended a prepayment of a scheduled obligation. For their part, the Smiths' confirmation promised to apply the Excess "to the *current* outstanding principal amount," (emphasis added) not to an upcoming scheduled payment. The Emeofas did not then object or explain a contrary intent. When the reinstatement payment cleared the bank, the Smiths again confirmed that the Excess "will be applied to the *current* [that is, September 2020] outstanding principal amount of the Note," (emphasis added) and they attached a revised payment schedule that plainly credited the Excess as of September 2020 and not as a prepayment of the December 2020 semiannual principal payment (which was still listed as an outstanding obligation on the payment schedule).

¶20 Emeofa now argues that they initially requested the Excess be applied as prepayment of the December 2020 semiannual payment and that

the Smiths agreed to do so. But he relies on later-sent emails—after the letters noted above, and after the Smiths received and applied the Excess to outstanding principal as of September 2020. To be sure, those emails evidenced the parties' differing views—after the fact—about whether the Excess was a free-standing principal payment or instead satisfied the December 2020 semiannual payment. And the court properly considered them when assessing whether the Smiths acted reasonably in refusing to redirect the Excess to avoid the dispute when the misunderstanding came to light. But the later-sent emails do not change that the Emeofas' initial request—that the Excess "be applied towards the outstanding obligation" and "go towards paying down the remaining amounts owed"—permitted the Smiths to apply the Excess as they ultimately did.

¶21        Emeofa criticizes the court's finding that immediate application of the Excess benefitted them by reducing their interest payments, highlighting instead that the ruling left in place a $25,000 principal payment due just three months after they had tendered $105,000. But a reduction in interest is a benefit, particularly when the dispute is focused on the timing of payments, not the underlying obligation. And although Emeofa asserts that the savings was nominal, applying the Excess as a freestanding principal payment in fact reduced every future monthly interest payment by $162.74 over the life of the note.

¶22        Accordingly, although the Emeofas offered evidence that they subjectively intended a different result, the record supports the court's conclusion that the Smiths permissibly applied the Excess to reduce principal as of September 2020 and not as a prepayment of the scheduled December 2020 semiannual principal payment. *See Castro*, 222 Ariz. at 51, ¶ 11 (noting that the appellate court considers competing evidence in the light most favorable to sustaining the superior court's ruling after trial).

### B.    Other Issues.

¶23        Emeofa offers two other claims of error regarding the merits ruling. First, he argues that the superior court improperly found that the Emeofas, as residential realtors, had an undue advantage over the Smiths. But the court drew no such conclusion. Although the court found that both of the Emeofas held real estate licenses—a fact that Emeofa does not dispute—the court did not "penalize" the Emeofas for that licensure or otherwise rely on that fact in rendering judgment.

¶24        Second, Emeofa asserts that the court erred by accepting the Smiths' proposed finding that the property's air conditioning units were in

good working order before the sale closed. But as the superior court noted, the Emeofas withdrew their repair claim before trial, and Emeofa does not explain how a finding related to an abandoned claim affected the ruling. Moreover, the invoice on which Emeofa now relies was not entered into evidence, and the evidence that was admitted at trial (including the Smiths' testimony) supports the court's finding.

## II.     Attorney's Fees.

¶25          After considering the parties' relative degrees of success and their relative degrees of reasonableness and unreasonableness, the court granted the Smiths an award of $30,000 in attorney's fees, substantially reduced from the nearly $86,000 requested. Emeofa challenges this award, asserting that the Smiths' unreasonable conduct and positions precipitated (and needlessly expanded) the litigation. We review the attorney's fees award for an abuse of discretion and will uphold the award if it has any reasonable basis. *See Associated Indem. Corp. v. Warner*, 143 Ariz. 567, 570–71 (1985); *see also Chase Bank of Ariz. v. Acosta*, 179 Ariz. 563, 575 (App. 1994) (contract fee provisions enforced by their terms); *Berry v. 352 E. Virginia, L.L.C.*, 228 Ariz. 9, 13–14, ¶¶ 21–24 (App. 2011) (discretionary "prevailing party" assessment). We likewise review the court's denial of a new trial on attorney's fees for an abuse of discretion. *See First Fin. Bank, N.A. v. Claassen*, 238 Ariz. 160, 162, ¶ 8 (App. 2015).

¶26          First, the court explained that the Emeofas' lawsuit—brought while indisputably in default under the note—was largely unnecessary and unsuccessful, asserting claims (other than one successful claim for $3,000 in pre-closing interest) that were patently meritless and, in some cases, nonsensical. Emeofa disputes this characterization, highlighting the successful claim for pre-closing interest and asserting instead that the Smiths' unreasonable positions necessitated the lawsuit. Granted, the Smiths' insistence on charging pre-closing interest justified the Emeofas' claim relating to pre-closing interest—which the court acknowledged and considered in assessing fees. But it does not explain the Emeofas' other claims related to never-specified damages for untimely closing, a later-abandoned assertion of uncompleted repairs, unjust enrichment despite a contractual relationship, or injunctive relief before a trustee's sale was noticed. Moreover, although Emeofa asserts the Smiths' June 2020 demand for $58,000 to cure default was baseless, the Emeofas had by then missed several months of $1,000 interest payments (even discounting the interest charged before closing) as well as two scheduled $25,000 principal payments.

¶27        Next, the court noted that the Emeofas needlessly expanded the proceedings by twice filing unnecessary requests to enjoin trustee's sales: once when the Smiths had already promised to (and within days did) cancel the sale as soon as the reinstatement checks cleared, and once when no sale had been noticed.  Emeofa again asserts that these actions were necessitated by the Smiths' unreasonableness.  Emeofa urges that the Smiths should have canceled the scheduled sale immediately upon tender of cashier's checks in an amount sufficient to reinstate the note, but the governing statutes allow the trustee 30 days after reinstatement to record a cancellation of the notice of sale.  *See* A.R.S. § 33-813(E).  The Smiths cancelled the sale (which was over two months away in any case) well within that timeframe.  And although Emeofa asserts that the Smiths "had threatened to do the same thing" again by sending a notice of breach for non-payment of the December 2020 semiannual principal payment, he does not explain how a notice of breach—without any notice of trustee's sale—required filing a request to enjoin a trustee's sale.  *Cf.* A.R.S. § 33-807(D) (prohibiting sale until 91 days after notice recorded).

¶28        Finally, the court noted that the Emeofas had unreasonably refused a walk-away settlement offer from the Smiths (one under which the Smiths would re-apply the Excess to satisfy the December 2020 principal payment and waive attorney's fees).  Emeofa argues, as he did in the motion for new trial, that the Smiths misrepresented what happened during settlement discussions and that the Smiths (not the Emeofas) unreasonably refused a walk-away offer made by the Emeofas.  The only information available to the court when rendering its initial ruling on fees, however, was that the Smiths made and the Emeofas refused a walk-away offer: the Smiths claimed as much in their fee application, and the Emeofas did not dispute it.  Although the Emeofas' motion for new trial asserted that the contrary was true, the motion did not attach any proof by affidavit or otherwise, so the court did not abuse its discretion by declining to override its prior ruling.  *See* Ariz. R. Civ. P. 59(a)(1)(A)–(B), 7.1(a)(2), (4).

## III.    Other Argument.

¶29        Emeofa also asserts that his case was harmed by poor legal representation "bordering on legal malpractice" by his own retained trial counsel.  Any such claim is beyond the scope of our review on appeal from the judgment in this case.

## IV.     Attorney's Fees on Appeal.

¶30       The Smiths request an award of attorney's fees and costs on appeal under the terms of the purchase agreement, the note, and the deed of trust and, alternatively, under A.R.S. § 12-341.01.  The Smiths' pleading did not cite the purchase agreement as a basis for a fee award, *see Berry*, 228 Ariz. at 13, ¶ 17, and the Smiths acknowledge that the deed of trust provides only for a limited award of fees under limited circumstances.  Nevertheless, we grant the Smiths' request for an award of reasonable fees under the promissory note (to the extent the cost of defending the appeal can be considered a "cost[] of collection" under the note) and, in our discretion, under § 12-341.01 upon compliance with ARCAP 21.  As the prevailing parties, the Smiths are entitled to an award of their costs on appeal upon compliance with ARCAP 21.  *See* A.R.S. § 12-341, -342(A).

## CONCLUSION

¶31       For the foregoing reasons, we affirm.



AMY M. WOOD • Clerk of the Court
FILED:    AA